UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| Myles Powell, and Jasmine Smith, | : | Civil Action No.: 2:21-cv-13709-WJM-JSA |
| | : | |
| Plaintiffs, | : | Second Amended Complaint and |
| | : | Jury Trial Demand |
| v. | : | |
| | : | |
| Seton Hall University, Kevin Willard, | : | |
| Tony Testa, Deja Craig, and John or Jane | : | |
| Does 1-10, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## I.    <u>INTRODUCTION</u>

Plaintiff Myles Powell ("Mr. Powell") and plaintiff Jasmine Smith ("Ms. Smith") were star basketball players and student athletes who devoted their soul and energy to bring success and fortune to Seton Hall University ("Seton Hall," "University" or "Institution"). In return, and to exploit their athletic skills and drive, key personnel of the University failed to advise them about what they knew were serious injuries each of them sustained while performing in basketball related activities on behalf of the Institution. Seton Hall did this knowing that continuing to play in the injured condition without immediate surgical repair would exacerbate the injury and seriously damage Mr. Powell's and Ms. Smith's opportunities including the ability to play basketball professionally.

## II.    <u>FACTS RELEVANT TO ALL COUNTS</u>

1.    Mr. Powell is an individual and citizen of New York with an address at 605 W. 42nd St., Unit 17U, New York, New York 10036.

2.      Ms. Smith is an individual and citizen of California with an address of 1 Loyola Marymount University Drive, Los Angeles, California 90045.

3.      Defendant Seton Hall is a private university with an address of 400 S Orange Avenue, South Orange, New Jersey 07079.

4.      Seton Hall's Mission Statement provides:

> Seton Hall University is a major Catholic university. In a diverse and collaborative environment it focuses on academic and ethical development. Seton Hall students are prepared to be leaders in their professional and community lives in a global society and are challenged by outstanding faculty, an evolving technologically advanced setting and values-centered curricula.

5.      Seton Hall is estimated to generate over ten million dollars of revenue per year from its collegiate basketball programs.

6.      Upon information and belief, Seton Hall does not pay any tax on these revenues, and nor does it pay its athletes any monies for their services to the Institution.

7.      Defendant Kevin Willard ("Coach Willard"), the Coach of the Seton Hall University Men's Basketball Team, has an address of 400 S Orange Avenue, South Orange, New Jersey 07079.

8.      Seton Hall pays Coach Willard a salary of over $1,600,000.00 per year.

9.      Defendant Tony Testa ("Mr. Testa"), the Director of Sports Medicine for Seton Hall, has an address of 400 S Orange Avenue, South Orange, New Jersey 07079.

10.     Seton Hall represents that Mr. Testa "coordinates and provides medical services for all student-athletes and works directly with the men's basketball and men's and women's golf teams."

11.     Mr. Testa also supervises the women's basketball team trainer.

12.     Mr. Testa teaches as an adjunct professor at Seton Hall in the School of Health and Medical Sciences and sits on its advisory board.

13.     Defendant Deja Craig ("Ms. Craig"), an Assistant Athletic Trainer for Seton Hall, has an address of 400 S Orange Avenue, South Orange, New Jersey 07079.

14.     Ms. Craig's supervisor is Mr. Testa.

15.     Defendant John or Jane Does 1-10 are individuals presently unknown to plaintiffs who participated in plaintiffs' care at the direction or knowledge of Seton Hall.

16.     During all relevant times, Coach Willard, Mr. Testa, and Ms. Craig were acting within the scope and course of their employment with Seton Hall.

17.     Mr. Powell was a stand-out high school player at Trenton Catholic High School, and South Kent High School, averaging more than 20 points a game.

18.     Mr. Powell was recruited by a number of colleges and universities to play collegiate basketball.

19.     Seton Hall approached Mr. Powell and represented that the University was the right place for him to play basketball due to its high-level basketball program, which included proper coaching, access to medical and other staff, and other benefits of a Division 1 basketball program.

20.     Seton Hall's representations that it would provide proper coaching, medical care, training, and oversight of Mr. Powell's basketball activities created a special relationship with Mr. Powell.

21.     Mr. Powell chose Seton Hall so he could stay close to his family in New Jersey, and based on the representations by the University that it was the best choice for him.

22.     In 2016, Mr. Powell began attending the University and playing basketball for it.

23.    His only compensation for playing basketball for the University was a scholarship to attend the University.

24.    Throughout his tenure with Seton Hall, Mr. Powell conferred a benefit to Seton Hall.

25.    Mr. Powell's success on the basketball court for the University brought considerable financial rewards to the University and the professionals who were allowed to be compensated for the revenues generated by the basketball program.

26.    Coach Willard believed that Mr. Powell was a key component to Seton Hall's chances of becoming a successful men's basketball program.

27.    For example, when asked about the difference in Mr. Powell from his first to second year at Seton Hall, Coach Willard stated, "The transformation he's done with his body is unbelievable. Last year he lost the weight but he was still soft. This year he's lost more weight but he's gotten his body fat down. He's leaner, quicker. He's been phenomenal." https://www.app.com/story/sports/college/2017/09/28/seton-hall-basketball-preseason-q-a-head-coach-kevin-willard/711247001/

28.    As a sophomore, Mr. Powell was named to the Big East All-Academic team and named the conference's Most Improved Player.

29.    In his junior season, Mr. Powell finished second in the Big East Conference in scoring with a 23.1-point average, with eight games of 30 points or better, including a season-high 40 points.

30.    At the close of the 2018-2019 season, his junior year of college, Mr. Powell was named first-team All-Big East and won the award as the top college player in the New York City metro area.

31.     Mr. Powell could have entered the NBA Draft after his junior season but his coaches and particularly his father wanted him to graduate from Seton Hall University.

32.     As incentive to stay in school, the coaches advised that the University would purchase insurance on Mr. Powell's behalf in the event he was injured during the following season.

33.     As he entered his senior year, the 2019-2020 NCAA season, expectations were high for Mr. Powell and for the Seton Hall Basketball Program, whose principals would no doubt continue to benefit financially by the success of Mr. Powell and the other student athletes whose compensation was limited to the scholarships they received.

34.     The Associated Press named Mr. Powell a preseason first-team All-American, and the Big East Conference named him preseason Big East Player of the Year.

35.     Prior to the beginning of Mr. Powell's senior season with Seton Hall, he had no relevant ankle, knee, or leg injury.

36.     During Seton Hall's November 9, 2019 game against Stony Brook, Mr. Powell suffered what he thought was a high ankle injury.

37.     He was examined by Coach Willard and Mr. Testa.

38.     This examination included a physical assessment of Mr. Powell's ankle by Mr. Testa.

39.     Coach Willard and Mr. Testa advised Mr. Powell that his injury was indeed confined to the ankle and continued play would not exacerbate the injury.

40.     Mr. Powell had no choice in the medical personnel involved in his care and treatment.

41.     Mr. Powell relied upon Seton Hall, Coach Willard, and Mr. Testa to provide him with proper care and information including regarding the extent of his injuries.

42.     Relying on the representations of Seton Hall, Coach Willard, and Mr. Testa that his injury was confined to his ankle and that continued play would not exacerbate his injury, Mr. Powell played in the next game on November 14, 2019 against the number 3 ranked Michigan State.

43.     Mr. Powell was still in pain from his ankle injury at the time of the game against Michigan State but played in that contest in reliance of defendants' statements.

44.     The game against Michigan State was important to defendants in light of Michigan State's high ranking.

45.     Though in pain, Mr. Powell played in that game and scored a game-high 37 points.

46.     In mid-December 2019, Mr. Powell began feeling pain in his right knee.

47.     Mr. Powell reported the pain to defendants.

48.     The pain in Mr. Powell's knee was so intense he was unable to practice with his team.

49.     Mr. Testa physically examined Mr. Powell's knee.

50.     Defendants, through Mr. Testa and with the knowledge of Coach Willard, injected Mr. Powell with a substance unknown to Mr. Powell to mask the pain, allowing Mr. Powell to continue to play basketball for Seton Hall.

51.     Defendants also provided Mr. Powell with pills to further mask Mr. Powell's pain.

52.     Mr. Powell is to this day unaware of what type of pills he was given.

53.     As a result of the injection and pills, Mr. Powell could withstand the pain in his knee enough to play in a game against DePaul on December 30th, scoring 27 points, and having five rebounds and five steals.

54.     Throughout the winter of 2019-2020, Mr. Powell continued to feel pain in his right knee, so much so that his practice time was severely limited.

55.     Defendants were aware that Mr. Powell's practice time was severely limited due to the pain caused by his knee injury.

56.     Whenever Mr. Powell would ask Mr. Testa about the pain, the trainer would advise it was just a bone bruise and that playing on it would not exacerbate the injury.

57.     Before these games, to alleviate or mask the pain, Mr. Testa would inject pain killer medicine into Mr. Powell's knee to allow him to play and perform on behalf of the University.

58.     At all times, Coach Willard was aware of the pain in Mr. Powell's knee, the advice given to Mr. Powell by Mr. Testa, and the steps Mr. Testa took to allow Mr. Powell to play basketball for the Seton Hall University Basketball Team.

59.     After playing against Georgetown on January 3, 2020, Mr. Powell, due to the pain, was physically unable to practice with his team.

60.     But as result of the constant injections and pills provided by Mr. Testa, Mr. Powell continued to play in the basketball games for Seton Hall.

61.     On January 6, 2020, Mr. Testa conducted another physical examination of Mr. Powell.

62.     Within this examination, Mr. Powell was laying on his back while Mr. Testa attempted to move Mr. Powell's knee to Mr. Powell's chest, and tried to move Mr. Powell's knee laterally.

63.     The pain was so intense that Mr. Powell could not complete these tasks.

64.     Mr. Testa injected Mr. Powell and provided him pills both on that date and on January 8, 2020 prior to Seton Hall's game against Xavier.

65.     Prior to the January 15, 2020 game against fifth ranked Butler, Mr. Testa again injected Mr. Powell and provided him pills.

66.     Mr. Powell scored 29 points in that game.

67.     On January 18, 2020, when Seton Hall beat St. Johns for its 8th straight win, Mr. Powell achieved a milestone achieved by few players in the history of Seton Hall University or college basketball in general, surpassing the 2,000-point milestone.

68.     Prior to that game, Mr. Testa injected Mr. Powell and provided him pills to mask the pain which permitted Mr. Powell to play in the basketball game on behalf of Seton Hall.

69.     What Mr. Powell did not know was that Seton Hall, Coach Willard, and Mr. Testa knew he had suffered not just an ankle injury during the season but a much more serious injury, a lateral meniscus tear to his right knee, which should have necessitated his sitting out the rest of the season so as not to exacerbate the injury.

70.     To that end, on January 14, 2020, Mr. Testa mistakenly texted to Mr. Powell, "Ya Myles Powell has a lateral meniscus tear."

71.     A lateral meniscus tear is an injury to the cartilage tissue, called meniscus, located on the knee.

8

72.     A lateral meniscal tear can occur when force is applied to the knee by another player or after a hard jump.

73.     The text was clearly sent to Mr. Powell in error as the text contained Mr. Powell's name.

74.     Upon belief, Mr. Testa later advised Coach Willard that Mr. Powell had a lateral meniscus tear.

75.     No representative of Seton Hall, including Coach Willard or Mr. Testa, advised Mr. Powell of what a lateral meniscus tear meant.

76.     Mr. Powell did not know what a lateral meniscus tear meant.

77.     Defendants knew, or should have known, that Mr. Powell did not know what a lateral meniscus tear meant.

78.     Mr. Testa downplayed the meaning of the text he mistakenly sent to Mr. Powell.

79.     The next text he sent to Mr. Powell read "Remember to take your medicine this morning."

80.     At no time did any defendant suggest to Mr. Powell that he stop playing, receive additional or different treatment, or consult with an independent medical professional.

81.     Seton Hall, Coach Willard, and Mr. Testa knew or should have known that Mr. Powell's playing with his injury would exacerbate it and have the effect of damaging Mr. Powell's employment prospects.

82.     Mr. Powell did not know that his playing with his injury would exacerbate the injury or that his employment prospects would be damaged.

83.     Due to the Covid 19 pandemic, Seton Hall's last game of the season was on March 7, 2020.

84.     Only after the season did defendants arrange for Mr. Powell to receive a more formal evaluation of his injury.

85.     On or about March 13, 2020, defendants sent Mr. Powell to be examined by Dr. Anthony Festa who at the time was affiliated with Imaging Specialists of North Jersey, LLC.

86.     Dr. Festa is also the Head Team Physician for Seton Hall.

87.     Mr. Testa told Mr. Powell to not go to any other medical professional.

88.     Mr. Testa took Mr. Powell to Dr. Festa.

89.     Dr. Festa performed an MRI on Mr. Powell's right knee.

90.     Neither Dr. Festa nor any other medical professional discussed Mr. Powell's medical care with Mr. Powell.

91.     Seton Hall, Coach Willard, and Mr. Testa acted in reckless disregard for the health and future of Mr. Powell.

92.     After the 2019-2020 college basketball season was cancelled due to Covid 19, in April 2020, Mr. Powell signed with the sports representation agency CAA.

93.     As a result of Mr. Powell being unable to work out to prepare for the process leading to the NBA draft, CAA directed Mr. Powell to consult with a pain management doctor who opined that Mr. Powell's injury was not a bone bruise as represented by defendants.

94.     CAA arranged for Mr. Powell, who was still in pain, to meet with Dr. Johannes Roedel of Jefferson Hospital.

95.     On June 23, 2020, Dr. Roedel examined Mr. Powell.

96.     Upon completion of the physical examination, Dr. Roedel directed Mr. Powell to Matthew Pepe, M.D., the Head Orthopedic Surgeon for the Philadelphia Eagles.

97.     Dr. Pepe arranged an MRI scan on Mr. Powell's knee.

98.    Both Dr. Roedel and Dr. Pepe opined that the MRI clearly showed a tear to Mr. Powell's lateral meniscus.

99.    Drs. Roedel and Pepe asked to review a copy of the March MRI arranged by Mr. Testa.

100.    Mr. Testa was uncooperative and would not provide Mr. Powell with a copy of the March MRI.

101.    Mr. Powell's representative learned who performed the March 2020 MRI and easily obtained a copy of it from the doctor's office.

102.    Drs. Roedel and Pepe compared the June 2020 image with the March 2020 image and opined that the scans were similar, and that the March 2020 scan clearly showed a tear to Mr. Powell's lateral meniscus.

103.    The image of the tear of the lateral meniscus in the March 2020 scan was so obvious it could not have been misdiagnosed.

104.    The opinion that Mr. Powell tore his lateral meniscus was shared by Mr. Testa back in January 2020.

105.    Such a standout college career capped by such a successful senior year should have guaranteed Mr. Powell to be selected as a lottery pick in the NBA Draft, but the professionals connected to the various teams in the NBA had suspected or discovered that Mr. Powell had a serious injury to his right knee that had gone untreated.

106.    In light of Mr. Powell's medical condition, of which he was unaware, no NBA team drafted Mr. Powell.

107.   Mr. Powell's father subsequently spoke with Coach Willard who conceded that defendants made a mistake in not properly disclosing Mr. Powell's injury and not properly treating his injury, and suggested that the family consult with counsel.

108.   Similar to Mr. Powell, Ms. Smith was a decorated high school basketball player.

109.   She was a three-time First Team All-District selection and the 2017 District MVP.

110.   She played her freshmen year of college basketball for the University of New Mexico and played her sophomore season for Trinity Valley Community College.

111.   Ms. Smith was recruited by Seton Hall to play her junior and senior college seasons for Seton Hall.

112.   Seton Hall approached Ms. Smith and, as it did to Mr. Powell, represented that it was the right place for her to play basketball due to its high-level basketball program, which included proper coaching, access to medical and other staff, and other benefits of a Division 1 basketball program.

113.   Seton Hall's representations that it would provide proper coaching, medical care, training, and oversight of Ms. Smith's basketball activities created a special relationship with Ms. Smith.

114.   Ms. Smith chose Seton Hall based on its representations and transferred to Seton Hall for the 2019-2020 basketball season.

115.   Her only compensation for playing basketball for the University was a scholarship to attend the University.

116.   Throughout her tenure with Seton Hall, Ms. Smith conferred a benefit to Seton Hall.

117.   During the 2019-2020 basketball season, Ms. Smith appeared in all 31 games for the team.

118.   In the 2020-2021 season, Ms. Smith was an academic merit award recipient.

119.   On August 10, 2020, Seton Hall provided Ms. Smith with a physical.

120.   Upon completion of the physical, Seton Hall noted no previous injuries to Ms. Smith and cleared her for full basketball related activities.

121.   On October 27, 2020, during a Seton Hall sanctioned basketball practice, Ms. Smith sustained an injury to her left knee.

122.   Ms. Smith could not walk upon injuring her knee.

123.   Senior Assistant Athletic Trainer Kaitlyn Kelly assisted Ms. Smith off the basketball court and advised that she believed Ms. Smith tore her ACL.

124.   Seton Hall referred Ms. Smith to a physician to obtain medical assistance, including two MRIs.

125.   Ms. Smith had no choice in the medical personnel involved in her care and treatment.

126.   Ms. Smith relied upon Seton Hall to provide her with proper care and information including regarding the extent of her injuries.

127.   Ms. Craig, supervised by Mr. Testa, advised Ms. Smith that the medical reports showed only a bone bruise and that it would heal on its own.

128.   As a result of this statement, Ms. Smith, who had been engaging in physical therapy, stopped seeking physical therapy.

129.   At no time did any doctor or other medical professional ever speak with Ms. Smith about her injury, test results, or treatment options.

130. By November 9, 2020, Ms. Smith began participating in non-contact drills.

131. By November 11, 2020, Seton Hall cleared Ms. Smith to proceed with full contact basketball drills.

132. Ms. Smith relied upon Seton Hall and its trainers and thus resumed normal activities as directed by these defendants.

133. After any extensive practice, workout, or competition, Ms. Smith's knee continued to swell and cause her pain.

134. Per the University's directive, she continued to ice her knee, take ibuprofen, and, per the University's representations, she continued to play basketball.

135. On February 8, 2021, Ms Smith played a basketball game for Seton Hall at Georgetown University.

136. After the game ended, Ms. Smith's knee was swollen.

137. She advised Ms. Craig of this and was told by Ms. Craig that the swelling was normal.

138. Ms. Craig provided Ms. Smith with a bag of ice and ibuprofen.

139. On March 17, 2021, after the basketball season ended, Ms. Smith had an exit physical with Ms. Craig.

140. Ms. Smith questioned Ms. Craig because Ms. Smith's knee was continuing to bother her.

141. Ms. Craig reiterated that Ms. Smith suffered only a bone bruise and nothing could be done.

142. Thereafter, Ms. Smith graduated from Seton Hall with one year left of college basketball eligibility.

143.   She registered with Loyola Marymount for the 2021-2022 basketball season, receiving an athletic scholarship which would allow her to continue her studies.

144.   She was given a physical through Loyola Marymount on June 14, 2021, at which time she advised of her "bone bruise" and continued swelling and pain.

145.   Loyola Marymount would not clear Ms. Smith to play basketball until she consulted with an orthopedic doctor due to her knee injury.

146.   Requests were made to Seton Hall for medical records but Seton Hall delayed in providing this information.

147.   It took several requests before Seton Hall finally agreed to forward Ms. Smith's medical records to her representatives.

148.   On June 21, 2021, Loyola Marymount arranged for Ms. Smith to receive an MRI of her knee.

149.   On June 23, 2021, Ms Smith met with the doctor who reviewed the MRI result.

150.   The doctor advised her that she had chondral defect in the knee that she injured during practice at Seton Hall.

151.   The defect measured 8x5 mm and the images from the most recent MRI showed essentially the same image as the MRI taken through Seton Hall.

152.   The doctor advised Ms. Smith that Seton Hall should have identified the extent of the problem with her knee and should not have released her to continue in workouts, practices, or games.

153.   The doctor further stated that Seton Hall should have been alarmed when Ms. Smith was released to normal activities but her knee was still swollen and it was clear that ice and ibuprofen were not addressing the problem.

154.   This doctor recommended that Ms. Smith receive an arthroscopic debridement/chondroplasty, arthroscopic microfracture, and osteochondral autograph transfer.

155.   He explained to her that this procedure is necessary now to prevent additional damage and to possibly prevent Ms. Smith from needing a full knee replacement later in her life.

156.   This treatment would cause Ms. Smith to be unable to play basketball for anywhere from several months to a year.

157.   The doctor also noted that during the surgery he may learn that the defect is more severe than what was shown on the MRI.

158.   Ms. Smith's surgery occurred on August 5, 2021.

159.   The defect was too big for microfracture surgery.

160.   As a result, Ms. Smith needed a second surgery which she has since received.

161.   She will be unable to play competitive basketball for at least one year and has lost her last year of eligibility.

162.   She also believes she could have played professionally in Europe after her last year of college eligibility but that hope has been extinguished.

163.   Seton Hall and its trainers acted in reckless disregard for the health and future of Ms. Smith.

164.   Seton Hall and its trainers knew or should have known that continuing to play with her injury would cause Ms. Smith significant harm later in life.

165.   Given what occurred to both Mr. Powell and Ms. Smith, it is clear it was a pattern and practice of Seton Hall, through its trainers and other personnel, to mislead its student athletes on its basketball teams about their physical conditions and injuries so as to have them continue to play for the benefit of Seton Hall to their physical detriment.

## III.   COUNTS

### COUNT ONE

### MR. POWELL v. MR. TESTA -  GROSS NEGLIGENCE

166.   Mr. Powell incorporates by reference all other paragraphs of this Amended Complaint as if fully set forth herein.

167.   At all times mentioned herein and material hereto Mr. Testa held himself out to be skillful and qualified to attend, care for, and render care and services to athletes such as Mr. Powell.

168.   Mr. Testa is Director of Sports Medicine at Seton Hall and concentrates his practice on the basketball program.

169.   At all relevant times, while Mr. Powell was under the care, and supervision of Mr. Testa, Mr. Powell suffered injuries due to Mr. Testa's want or absence of, or failure to exercise, slight care or diligence.

170.   Mr. Powell's injuries occurred as a direct and proximate result of the gross negligence of Mr. Testa.

171.   Mr. Testa's gross negligence included, but was not limited to, the following:

a.      Failing to properly diagnose and treat Mr. Powell's lateral meniscus tear to his right knee;

b.      Failing to properly and fully inform Mr. Powell regarding his injuries and the risks of continued play with the aforesaid injuries;

c.      Failing to uphold the proper standard of care under the circumstances presented; and

d.      Failing to properly supervise and control the procedures set forth above.

17

172.   As a direct and proximate result of the negligence of Mr. Testa as set forth above, Mr. Powell suffered severe and permanent injuries, including physical pain, emotional distress, and monetary damages.

**WHEREFORE**, Mr. Powell requests judgment in his favor and against Mr. Testa for an order granting Mr. Powell damages and other appropriate relief.

<u>COUNT TWO</u>

<u>MR. POWELL v. COACH WILLARD -  GROSS NEGLIGENCE</u>

173.   Mr. Powell incorporates by reference all other paragraphs of this Amended Complaint as if fully set forth herein.

174.   During all relevant times, Coach Willard, in his role as coach of the basketball team, was acting as an agent of Seton Hall.

175.   As set forth above, Mr. Powell's injuries occurred due to Coach Willard's want or absence of, or failure to exercise, slight care or diligence.

176.   Mr. Powell's injuries occurred as a direct and proximate result of the gross negligence of Coach Willard.

177.   Coach Willard was grossly negligent in failing to properly safeguard the health and safety of Mr. Powell.

**WHEREFORE**, Mr. Powell requests judgment in his favor and against Coach Willard for an order granting Mr. Powell damages and other appropriate relief.

<u>COUNT THREE</u>

<u>MR. POWELL v. SETON HALL -  GROSS NEGLIGENCE</u>

178.   Mr. Powell incorporates by reference all other paragraphs of this Amended Complaint as if fully set forth herein.

18

179.    At all relevant times hereto, Seton Hall acted by and through its agents, servants and employees, including but not limited to Mr. Testa and Coach Willard.

180.    Seton Hall is vicariously liable for the gross negligence of Mr. Testa and Coach Willard including such acts of gross negligence described above.

181.    Seton Hall is directly liable for failing to monitor and supervise the conduct of all persons who attended to Mr. Powell.

182.    In addition, Seton Hall has assumed a duty to protect the health and safety of its student-athletes.

183.    As a direct and proximate result of the gross negligence of Seton Hall, Coach Willard, and Mr. Testa, jointly and severally, as set forth above, Mr. Powell suffered severe and permanent injuries, including physical pain, emotional distress, and monetary damages.

**WHEREFORE**, Mr. Powell requests judgment in his favor and against Seton Hall University for an order granting Mr. Powell damages and other appropriate relief.

## COUNT FOUR

### MS. SMITH v. MS. CRAIG -  GROSS NEGLIGENCE

184.    Ms. Smith incorporates by reference all other paragraphs of this Amended Complaint as if fully set forth herein.

185.    At all times mentioned herein and material hereto Ms. Craig held herself out to be skillful and qualified to attend, care for, treat and render services to athletes such as Ms. Craig.

186.    Ms. Craig is an Assistant Athletic Trainer at Seton Hall and concentrates her practice on the basketball program.

187.    She is supervised by Mr. Testa and acts under his control.

188.   At all relevant times, while Ms. Smith was under the care, and supervision of Ms. Craig and Mr. Testa, Ms. Smith suffered injuries due to Ms. Craig's and Mr. Testa's want or absence of, or failure to exercise, slight care or diligence.

189.   Ms. Smith's injuries occurred as a direct and proximate result of the gross negligence of Ms. Craig and Mr. Testa.

190.   Ms. Craig's gross negligence included, but was not limited to, the following:

a.      Failing to properly diagnose and treat Ms. Smith's knee injury;

b.      Failing to properly and fully inform Ms. Smith regarding her injuries and the risks of continued play with the aforesaid injuries;

c.      Failing to uphold the proper standard of care under the circumstances presented; and

d.      Failing to properly supervise and control the procedures set forth above.

191.   As a direct and proximate result of the gross negligence of Ms. Craig as set forth above, Ms. Smith suffered severe and permanent injuries, including physical pain, emotional distress, and monetary damages.

**WHEREFORE**, Ms. Smith requests judgment in her favor and against Ms. Craig for an order granting Ms. Smith damages and other appropriate relief.

### COUNT FIVE

### MS. SMITH v. MR. TESTA -  GROSS NEGLIGENCE

192.   Ms. Smith incorporates by reference all other paragraphs of this Amended Complaint as if fully set forth herein.

193.    At all relevant times, while Ms. Smith was under the care, and supervision of Ms. Craig and Mr. Testa, Ms. Smith suffered injuries due to Ms. Craig's and Mr. Testa's want or absence of, or failure to exercise, slight care or diligence.

194.    Ms. Smith's injuries occurred as a direct and proximate result of the gross negligence of Ms. Craig and Mr. Testa.

195.    Mr. Testa's gross negligence included, but was not limited to, the following:

   a.      Failing to properly diagnose and treat Ms. Smith's knee injury;

   b.      Failing to properly and fully inform Ms. Smith regarding her injuries and the risks of continued play with the aforesaid injuries;

   c.      Failing to uphold the proper standard of care under the circumstances presented; and

   d.      Failing to properly supervise and control the procedures set forth above.

196.    As a direct and proximate result of the gross negligence of Mr. Testa as set forth above, Ms. Smith suffered severe and permanent injuries, including physical pain, emotional distress, and monetary damages.

**WHEREFORE**, Ms. Smith requests judgment in her favor and against Mr. Testa, jointly and severally, for an order granting Ms. Smith damages and other appropriate relief.

<u>**COUNT SIX**</u>

<u>**MS. SMITH v. SETON HALL -  GROSS NEGLIGENCE**</u>

197.    Ms. Smith incorporates by reference all other paragraphs of this Amended Complaint as if fully set forth herein.

198.    At all relevant times hereto, Seton Hall acted by and through its agents, servants and employees, including but not limited to Ms. Craig and Mr. Testa.

199.   Seton Hall is vicariously liable for the gross negligence of Ms. Craig and Mr. Testa including such acts of gross negligence described above.

200.   Seton Hall is directly liable for failing to monitor and supervise the conduct of all persons who attended to Ms. Smith.

201.   In addition, Seton Hall has assumed a duty to protect the health and safety of its student-athletes.

202.   As a direct and proximate result of the gross negligence of Seton Hal, as set forth above, Ms. Smith suffered severe and permanent injuries, including physical pain, emotional distress, and monetary damages.

**WHEREFORE**, Ms. Smith requests judgment in her favor and against Seton Hall University for an order granting Ms. Smith damages and other appropriate relief.

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.

Date:   May 24, 2022              By:   */s/Alan C. Milstein*
                                        Alan C. Milstein, Esquire
                                        Jeffrey P. Resnick, Esquire
                                        308 Harper Drive, Suite 200
                                        Moorestown, NJ 08057
                                        Telephone: (856) 662-0700
                                        Facsimile: (856) 661-2068
                                        E-mail: amilstein@shermansilverstein.com
                                                jresnick@shermansilverstein.com
                                        Attorneys for Plaintiffs Myles Powell and
                                        Jasmine Smith

## JURY TRIAL DEMAND

Please take notice that the plaintiffs demand a trial by jury as to all issues in the above matter.

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.

Date:  May 24, 2022

By:  _/s/Alan C. Milstein_
Alan C. Milstein, Esquire
Jeffrey P. Resnick, Esquire
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: (856) 662-0700
Facsimile: (856) 661-2068
E-mail: amilstein@shermansilverstein.com
        jresnick@shermansilverstein.com
Attorneys for Plaintiffs Myles Powell and
Jasmine Smith