IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MYLES POWELL and JASMINE SMITH,<br><br>  Plaintiffs,<br><br>  v.<br><br>SETON HALL UNIVERSITY, KEVIN WILLARD, TONY TESTA, DEJA CRAIG, and JOHN OR JANES DOES 1-10,<br><br>  Defendants. | Case No. 2:21-cv-13709-WJM-JSA<br><br>**Return Date: August 15, 2022** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS COUNTS I-III OF PLAINTIFFS'
SECOND AMENDED COMPLAINT**

Alan C. Milstein
Jeffrey P. Resnick
SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-661-2068
amilstein@shermansilverstein.com
jresnick@shermansilverstein.com
Attorneys for Plaintiffs

### TABLE OF CONTENTS

Table of Authorities ............................................................................................... ii

Preliminary Statement ............................................................................................ 1

Statement of Relevant Factual and Procedural History .......................................... 3

Argument ............................................................................................................... 15

      I.     Legal Standard.......................................................................... 15

      II.    Dismissal of Mr. Powell's Claims Pursuant to Rule 12(b)(6) is Not Warranted .. 16

      III.   Dismissal With Prejudice is Inappropriate ........................................... 23

Conclusion ............................................................................................................. 24

3100960.1

## **TABLE OF AUTHORITIES**

### **Federal Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...................................................................15, 16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)..........................................15, 16

*Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002) .........................................23

*Hedges v. United States*, 404 F.3d 744 (3d Cir. 2005) .................................................15

*Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424 (D.N.J. 1999) ...................................23

*Jarrah v. Trump Hotels & Casino Resorts, Inc.*, 487 F.Supp.2d 522 (D.N.J. 2007) ..................22

*Jerkins v. Anderson*, 191 N.J. 285, 298 (2007) .............................................17, 18, 19

*Lindstrom v. St. Joseph's School of the Blind, Inc.*, 2016 WL 5723658 (D.N.J. September 30, 2016)..................................................................................................16

*Smith v. Kroesen*, 9 F. Supp. 3d 439 (D.N.J. 2014)...................................................18

*W.H. v. R.C.*, 2020 WL 1041390 (D.N.J. March 4, 2020) ...................................18, 19

### **State Cases**

*Basil v. Wolf*, 193 N.J. 38 (2007).......................................................................21

*Clarke v. Twp of Mount Laurel*, 357 N.J. Super. 362 (App. Div.2003) ..........................17

*Franco v. Fairleigh Dickinson University*, 467 N.J. Super. 8 (App. Div. 2021) ..........................19

*Ivy Hill Park Section III v. Smirnova*, 362 N.J. Super. 421 (Law. Div. 2003)..........................17

*J.D. ex rel M.B.-D. v. Garfield Park Academy*, 2014 WL 6474331 (App. Div. Nov. 20, 2014)  17

*Steinberg v. Sahara Sam's Oasis, LLC*, 226 N.J. 344 (2016).......................................18

*Stuyvesant Assocs. v. Doe*, 221 N.J. Super. 340 (Law. Div. 1987) .................................18

### **Rules**

Federal Rule of Civil Procedure 12(b)(6)................................................................ passim

3100960.1

**<u>Other Authorities</u>**

*Model Jury Charge (Civil)* § 5.12 "Gross Negligence" (2009).....................................................18

https://www.app.com/story/sports/college/2017/09/28/seton-hall-basketball-preseason-q-a-head-coach-kevin-willard/711247001/.................................................................................................5

https://www.mayoclinic.org/diseases-conditions/torn-meniscus/diagnostice-treatment/drc-20354823 .........................................................................................................................................20

https://www.shu.edu/health-services/patient-rights-and-responsibilities.cfm...............................3

## PRELIMINARY STATEMENT

Despite allegations which clearly establish a cause of action for gross negligence, defendants move to dismiss the claims of plaintiff Myles Powell ("Mr. Powell")[1] arising out of the conduct of defendant Seton Hall University ("Seton Hall," or "University"), its former men's basketball coach, Kevin Willard ("Coach Willard"), and its Director of Sports Medicine, Tony Testa ("Mr. Testa") (collectively "defendants") in risking Mr. Powell's medical care so that Seton Hall could be more competitive in its men's basketball games.  Defendants knew or believed that Mr. Powell sustained a lateral meniscus tear of the right knee during the course of his tenure as a star athlete for the Seton Hall basketball team and should have been aware of the potential effects of his continuing to play with that injury.  Defendants concealed the potential risks from Mr. Powell, who, after receiving pain killers and other treatment from defendants, played with the injury, and unfortunately suffered the consequences.

Defendants' argument that Mr. Powell fails to state a claim for gross negligence is based on a misunderstanding of the basis for Mr. Powell's claim.  Defendants' sole basis for their Motion is their repeated assertion that a March 13, 2020, MRI scan, orchestrated by Mr. Testa purportedly stated there is no lateral meniscus tear.  The defendants are wrong in characterizing the March 13, 2020, MRI scan as "the centerpiece"[2] or "the very document that now forms the basis"[3] of Mr. Powell's Second Amended Complaint.  Just the contrary is true.  After Mr. Powell left control of his medical care to Seton Hall, another physician advised him after a subsequent

---

[1] Mr. Powell's claims are set forth in Counts I-III of the Second Amended Complaint and Jasmine Smith's claims are set forth in Counts IV-VI.  Defendants' Motion does not seek dismissal of Ms. Smith's claims.
[2] Def. Br. at ECF 19-1, page 12 of 25.
[3] Def. Br. at ECF 19-1, page 7 of 25.

1

MRI that Mr. Powell had a lateral meniscus tear and that the image in the subsequent MRI was similar to the prior image.

The key fact underlying Mr. Powell's claims is thus not the MRI taken a week after the season ended. Whether that MRI was wrongly misdiagnosed is irrelevant. Mr. Powell did have a lateral meniscus tear properly diagnosed after he left Seton Hall, and defendants believed Mr. Powell suffered that lateral meniscus tear in January 2020. Moreover, instead of explaining to Mr. Powell the potential ramifications of such a condition, they drugged him up and let him play.

There can be no dispute that on January 14, 2020, Mr. Testa mistakenly texted to Mr. Powell, "Ya, Myles Powell has a lateral meniscus tear."[4] Defendants' failure to address this in their Motion speaks volumes. In the Motion's sole reference to the text, defendants actually criticize Mr. Powell, a college student with no medical training dependent on the advice of those with the responsibility to care for him. Defendants argue: "Defendant Testa allegedly texted Plaintiff Powell with his opinion that Powell 'has a lateral meniscus tear' and Powell, who up until this time had allegedly been assured that he only had a bone bruise, did not find anything suspicious about this alleged about-face."[5] Defendants then invent facts- with no support- and assert that Mr. Powell "disregarded this alleged admission and continued playing on his alleged torn meniscus."[6] Nothing could be further from the truth.

Mr. Powell relied on the continued verbal assertion of Defendants that all he had was a minor injury and that, whatever the injury, he could continue to play without exacerbating his condition. In fact, as alleged in the Second Amended Complaint, when Mr. Powell's father eventually spoke with Coach Willard, the coach conceded that defendants made a mistake in not

---

[4] See screenshot of the January 14, 2020 text message, attached to the Certification of Alan C. Milstein as Exhibit "1."

[5] Def. Br. at ECF 19-1, page 11 of 25.

[6] Def. Br. at ECF 19-1, page 11 of 25.

properly disclosing Mr. Powell's injury and not properly treating his injury, and suggested that the family consult with counsel.

Based on the facts and the law, dismissal of Mr. Powell's claims must be denied. At a minimum, dismissal is premature at this stage of the pleadings. Contrary to defendants' argument, there is no basis to find that Mr. Powell's gross negligence claim fails to state a cause of action. Further, defendants' request for dismissal with prejudice is unsupported by longstanding case law and should be rejected.  In the event the Court is inclined to grant defendants' Motion—and it should not-- plaintiffs respectfully request the opportunity to file an amended pleading to cure any deficiencies noted by this Honorable Court.

## STATEMENT OF RELEVANT FACTUAL AND PROCEDURAL HISTORY

As set forth on Seton Hall's website for prospective students to read, Seton Hall's Mission Statement provides:

> Seton Hall University is a major Catholic university. In a diverse and collaborative environment it focuses on academic and ethical development. Seton Hall students are prepared to be leaders in their professional and community lives in a global society and are challenged by outstanding faculty, an evolving technologically advanced setting and values-centered curricula.[7]

Seton Hall further promises its students that they will be treated with "respect and dignity," and in the context of health care services provided by the University, its students will " be informed about the diagnosis, treatment and prognosis of the health problem in terms that can be understood" and "to know the potential effects of treatment and to know the possible risks, side effects and alternative methods of treatment."[8]

---

[7] Second Amended Complaint, Paragraph 4, attached to defendants' Motion as Exhibit B.
[8] https://www.shu.edu/health-services/patient-rights-and-responsibilities.cfm

3100960 1

Seton Hall is estimated to generate over ten million dollars of revenue per year from its collegiate basketball programs.[9]  Upon information and belief, Seton Hall does not pay any tax on these revenues, and nor does it pay its athletes any monies for their services to the Institution.[10] Seton Hall paid Coach Willard a salary of over $1,600,000.00 per year.[11]

Mr. Testa, the Director of Sports Medicine for Seton Hall, "coordinates and provides medical services for all student-athletes and works directly with the men's basketball and men's and women's golf teams," supervises the women's basketball team trainer, teaches as an adjunct professor at Seton Hall in the School of Health and Medical Sciences and sits on its advisory board.[12]

Mr. Powell was a stand-out high school player at Trenton Catholic High School, and South Kent High School, averaging more than 20 points a game.[13] Mr. Powell was recruited by a number of colleges and universities to play collegiate basketball.[14]  Seton Hall approached Mr. Powell and represented that the University was the right place for him to play basketball due to its high-level basketball program, which included proper coaching, access to medical and other staff, and other benefits of a Division 1 basketball program.[15]  Seton Hall's representations that it would provide proper coaching, medical care, training, and oversight of Mr. Powell's basketball activities created a special relationship with Mr. Powell.[16]

Mr. Powell chose Seton Hall so he could stay close to his family in New Jersey, and based on the representations by the University that it was the best choice for him.[17] In 2016, Mr.

---

[9] Second Amended Complaint, Paragraph 5.
[10] Second Amended Complaint, Paragraph 6.
[11] Second Amended Complaint, Paragraph 8.
[12] Second Amended Complaint, Paragraphs 9-12.
[13] Second Amended Complaint, Paragraph 17.
[14] Second Amended Complaint, Paragraph 18.
[15] Second Amended Complaint, Paragraph 19.
[16] Second Amended Complaint, Paragraph 20.
[17] Second Amended Complaint, Paragraph 21.

3100960.1

Powell began attending the University and playing basketball for the team.[18]  His only compensation for playing basketball was a scholarship to attend the University.[19]

Throughout his tenure with Seton Hall, Mr. Powell conferred a benefit to Seton Hall.[20] Mr. Powell's success on the basketball court for the University brought considerable financial rewards to the University and the professionals who were allowed to be compensated for the revenues generated by the basketball program.[21]

Coach Willard believed that Mr. Powell was a key component to Seton Hall's chances of becoming a successful men's basketball program.[22] For example, when asked about the difference in Mr. Powell from his first to second year at Seton Hall, Coach Willard stated, "The transformation he's done with his body is unbelievable. Last year he lost the weight but he was still soft. This year he's lost more weight but he's gotten his body fat down. He's leaner, quicker. He's been phenomenal."[23]

As a sophomore, Mr. Powell was named to the Big East All-Academic team and named the conference's Most Improved Player.[24]  In his junior season, Mr. Powell finished second in the Big East Conference in scoring with a 23.1-point average, with eight games of 30 points or better, including a season-high 40 points.[25]  At the close of the 2018-2019 season, his junior year of college, Mr. Powell was named first-team All-Big East and won the award as the top college player in the New York City metro area.[26]

---

[18] Second Amended Complaint, Paragraph 22.
[19] Second Amended Complaint, Paragraph 23.
[20] Second Amended Complaint, Paragraph 24.
[21] Second Amended Complaint, Paragraph 25.
[22] Second Amended Complaint, Paragraph 26.
[23] Second Amended Complaint, Paragraph 27, https://www.app.com/story/sports/college/2017/09/28/seton-hall-basketball-preseason-q-a-head-coach-kevin-willard/711247001/.
[24] Second Amended Complaint, Paragraph 28.
[25] Second Amended Complaint, Paragraph 29.
[26] Second Amended Complaint, Paragraph 30.

3100960.1

Mr. Powell could have entered the NBA Draft after his junior season but his coaches and particularly his father wanted him to graduate from Seton Hall University.[27] As incentive to stay in school, the coaches advised that the University would purchase insurance on Mr. Powell's behalf in the event he was injured during the following season.[28]

As he entered his senior year, the 2019-2020 NCAA season, expectations were high for Mr. Powell and for the Seton Hall Basketball Program, whose principals would no doubt continue to benefit financially by the success of Mr. Powell and the other student athletes whose compensation was limited to the scholarships they received.[29] The Associated Press named Mr. Powell a preseason first-team All-American, and the Big East Conference named him preseason Big East Player of the Year.[30]

Prior to the beginning of Mr. Powell's senior season with Seton Hall, he had no relevant ankle, knee, or leg injury.[31]  During Seton Hall's November 9, 2019, game against Stony Brook, Mr. Powell suffered what he thought was a high ankle injury.[32]  He was examined by Coach Willard and Mr. Testa.[33] This examination included a physical assessment of Mr. Powell's ankle by Mr. Testa who, though not an physician, held himself out as an expert in diagnosing and treating sports injuries.[34]  Coach Willard and Mr. Testa advised Mr. Powell that his injury was indeed confined to the ankle and continued play would not exacerbate the injury.[35] Mr. Powell had no choice in the medical personnel involved in his care and treatment.[36]

---

[27] Second Amended Complaint, Paragraph 31.
[28] Second Amended Complaint, Paragraph 32.
[29] Second Amended Complaint, Paragraph 33.
[30] Second Amended Complaint, Paragraph 34.
[31] Second Amended Complaint, Paragraph 35.
[32] Second Amended Complaint, Paragraph 36.
[33] Second Amended Complaint, Paragraph 37.
[34] Second Amended Complaint, Paragraph 38.
[35] Second Amended Complaint, Paragraph 39.
[36] Second Amended Complaint, Paragraph 40.

Mr. Powell relied upon Seton Hall, Coach Willard, and Mr. Testa to provide him with proper care and information regarding what if any injury he might sustain, the extent of his injuries, the course of treatment, and whether he could continue to play on an injury without further damage.[37]

Relying on the representations of Seton Hall, Coach Willard, and Mr. Testa that his injury was minor and that continued play would not exacerbate his condition, Mr. Powell played in the next game on November 14, 2019 against the number 3 ranked Michigan State.[38]  Mr. Powell was still in pain from his ankle injury at the time of the game against Michigan State but played in that contest in reliance on defendants' statements.[39]  The game against Michigan State was important to defendants in light of Michigan State's high ranking.[40] Though in pain, Mr. Powell played and scored a game-high 37 points.[41] It is unclear whether the ankle injury caused Mr. Powell to favor one leg over the other but that would not be atypical for such an injury.

In any event, by mid-December 2019, Mr. Powell began feeling pain in his right knee.[42] Mr. Powell reported the pain to defendants.[43] The pain in Mr. Powell's knee was so intense he was unable to practice with his team.[44] Mr. Testa physically examined Mr. Powell's knee and Mr. Testa, and with the knowledge of Coach Willard, injected Mr. Powell with a substance unknown to Mr. Powell to mask the pain, allowing Mr. Powell to continue to play basketball for Seton Hall.[45] Defendants also provided Mr. Powell with pills to further mask his pain.[46] Mr.

---

[37] Second Amended Complaint, Paragraph 41.
[38] Second Amended Complaint, Paragraph 42.
[39] Second Amended Complaint, Paragraph 43.
[40] Second Amended Complaint, Paragraph 44.
[41] Second Amended Complaint, Paragraph 45.
[42] Second Amended Complaint, Paragraph 46.
[43] Second Amended Complaint, Paragraph 47.
[44] Second Amended Complaint, Paragraph 48.
[45] Second Amended Complaint, Paragraphs 49-50.
[46] Second Amended Complaint, Paragraph 51.

Powell is to this day unaware of what type of pills he was given.[47] As a result of the injection and pills, Mr. Powell could withstand the pain in his knee enough to play in a game against DePaul on December 30th, scoring 27 points, hauling in five rebounds and making five steals.[48]

Throughout the winter of 2019-2020, Mr. Powell continued to feel pain in his right knee, so much so that his practice time was severely limited.[49] Defendants were aware that Mr. Powell' could not practice with the team due to the pain he was experiencing.[50] Whenever Mr. Powell would ask Mr. Testa about the pain, the trainer would advise it was just a bone bruise and that playing on it would not exacerbate the injury.[51]

Before these games, to alleviate or mask the pain, Mr. Testa continued to inject pain killer medicine directly into Mr. Powell's knee to allow him to play and perform on behalf of the University.[52] At all times, Coach Willard was aware of the pain in Mr. Powell's knee, the advice given to Mr. Powell by Mr. Testa, and the steps Mr. Testa took to allow Mr. Powell to play basketball.[53]

After playing against Georgetown on January 3, 2020, Mr. Powell was physically unable to practice with his team due to the pain.[54] But, as result of the constant injections and pills provided by Mr. Testa, Mr. Powell continued to play in the basketball games for Seton Hall.[55]

On January 6, 2020, Mr. Testa conducted a thorough physical examination of Mr. Powell.[56] Mr. Testa had Mr. Powell lay on his back while Mr. Testa attempted to move Mr.

---

[47] Second Amended Complaint, Paragraph 52.
[48] Second Amended Complaint, Paragraph 53.
[49] Second Amended Complaint, Paragraph 54.
[50] Second Amended Complaint, Paragraph 55.
[51] Second Amended Complaint, Paragraph 56.
[52] Second Amended Complaint, Paragraph 57.
[53] Second Amended Complaint, Paragraph 58.
[54] Second Amended Complaint, Paragraph 59.
[55] Second Amended Complaint, Paragraph 60.
[56] Second Amended Complaint, Paragraph 61.

Powell's knee to Mr. Powell's chest, and then tried to move Mr. Powell's knee laterally.[57] This is not the kind of examination one conducts for a bone bruise or ankle injury; it is precisely the examination if one suspects a meniscus tear. The pain was so intense, however, Mr. Powell could not complete these tasks.[58] Mr. Testa then injected Mr. Powell's knee with a  substance from a needle and provided him pills both on that date and on January 8, 2020, prior to Seton Hall's game against Xavier.[59]

Prior to the January 15, 2020 game against fifth ranked Butler, Mr. Testa again injected Mr. Powell's knee and provided him pills, and Mr. Powell scored 29 points in that game.[60] On January 18, 2020, when Seton Hall beat St. Johns for its 8th straight win, Mr. Powell achieved a milestone achieved by few players in the history of Seton Hall University or college basketball in general, surpassing the 2,000-point milestone.[61] Prior to that game, Mr. Testa injected Mr. Powell and provided him pills to mask the pain which permitted Mr. Powell to play in the basketball game on behalf of Seton Hall.[62]

What Mr. Powell did not know was that Seton Hall, Coach Willard, and Mr. Testa knew he had suffered not just an ankle injury during the season but a much more serious injury, a lateral meniscus tear to his right knee, which should have necessitated his sitting out the rest of the season so as not to exacerbate the injury.[63] To that end, on January 14, 2020, nine days after the thorough physical examination when he tried to move and rotate Mr. Powell's leg, Mr. Testa mistakenly texted to Mr. Powell, "Ya Myles Powell has a lateral meniscus tear."[64] A lateral

---

[57] Second Amended Complaint, Paragraph 62.
[58] Second Amended Complaint, Paragraph 63.
[59] Second Amended Complaint, Paragraph 64.
[60] Second Amended Complaint, Paragraphs 65-66.
[61] Second Amended Complaint, Paragraph 67.
[62] Second Amended Complaint, Paragraph 68.
[63] Second Amended Complaint, Paragraph 69.
[64] Second Amended Complaint, Paragraph 70.

9

meniscus tear is an injury to the cartilage tissue, called meniscus, located on the knee.[65] A lateral meniscal tear can occur when force is applied to the knee by another player or after a hard jump.[66] The text was clearly sent to Mr. Powell in error as it referred to Mr. Powell's in the third person.[67] Upon belief, Mr. Testa later advised Coach Willard that Mr. Powell had a lateral meniscus tear.[68]

No representative of Seton Hall, including Coach Willard or Mr. Testa, advised Mr. Powell of what a lateral meniscus tear meant[69] and Mr. Powell did not know what a lateral meniscus tear meant,[70] a fact Defendants knew, or should have known.[71] Mr. Testa downplayed the meaning of the text he mistakenly sent to Mr. Powell.[72] The next text he sent to Mr. Powell read "Remember to take your medicine this morning."[73] The fact that Defendants have argued that the text absolves them because, mistaken or not, Mr. Powell received the information speaks volumes. First, it belies their assertion that they believed the results of the March MRI and affirms that they knew Mr. Powell in fact had such a tear at least as of the prior January. Second, Mr. Powell was an impressionable young man who believed Defendants had his best interests at heart. If they let him play, he had to believe, they thought he could play without risking serious injury. And clearly, after giving him pills and injecting him with pain killers, they let him play, even if he could otherwise not practice with the team.

---

[65] Second Amended Complaint, Paragraph 71.
[66] Second Amended Complaint, Paragraph 72.
[67] Second Amended Complaint, Paragraph 73.
[68] Second Amended Complaint, Paragraph 74.
[69] Second Amended Complaint, Paragraph 75.
[70] Second Amended Complaint, Paragraph 76.
[71] Second Amended Complaint, Paragraph 77.
[72] Second Amended Complaint, Paragraph 78.
[73] Second Amended Complaint, Paragraph 79.

At no time did any defendant suggest to Mr. Powell that he stop playing, receive additional or different treatment, or consult with an independent medical professional.[74] Seton Hall, Coach Willard, and Mr. Testa knew or should have known that Mr. Powell's playing with his injury would exacerbate it and have the effect of damaging Mr. Powell's employment prospects.[75] Mr. Powell, however, did not know that his playing with his injury would exacerbate the injury or that his employment prospects would be damaged.[76] Seton Hall, Coach Willard, and Mr. Testa thus acted in reckless disregard for the health and future of Mr. Powell.[77]

Due to the Covid 19 pandemic, Seton Hall's last game of the season was on March 7, 2020.[78] Only after the season did defendants arrange for Mr. Powell to receive a more formal evaluation of his injury.[79]

On or about March 13, 2020, defendants sent Mr. Powell to be examined by Dr. Anthony Festa, Head Team Physician for Seton Hall, who at the time, was affiliated with Imaging Specialists of North Jersey, LLC.[80] Mr. Testa told Mr. Powell to not go to any other medical professional.[81] In fact, Mr. Testa physically took Mr. Powell to Dr. Festa[82] who performed an MRI on Mr. Powell's right knee.[83]

---

[74] Second Amended Complaint, Paragraph 80.
[75] Second Amended Complaint, Paragraph 81.
[76] Second Amended Complaint, Paragraph 82.
[77] Second Amended Complaint, Paragraph 91.
[78] Second Amended Complaint, Paragraph 83.
[79] Second Amended Complaint, Paragraph 84.
[80] Second Amended Complaint, Paragraphs 85-86.
[81] Second Amended Complaint, Paragraph 87.
[82] Second Amended Complaint, Paragraph 88.
[83] Second Amended Complaint, Paragraph 89.

Neither Dr. Festa nor Mr. Testa or any other medical professional discussed Mr. Powell's medical care with Mr. Powell.[84] After the 2019-2020 college basketball season was cancelled due to Covid 19, in April 2020, Mr. Powell signed with the sports representation agency CAA.[85] As a result of Mr. Powell being unable to work out to prepare for the process leading to the NBA draft, CAA directed Mr. Powell to consult with a pain management doctor who opined that Mr. Powell's injury was not a bone bruise as represented by defendants.[86]

CAA arranged for Mr. Powell, who was still in pain, to meet with Dr. Johannes Roedel of Jefferson Hospital.[87] On June 23, 2020, Dr. Roedel examined Mr. Powell and, upon completion of the physical examination, Dr. Roedel directed Mr. Powell to Matthew Pepe, M.D., the Head Orthopedic Surgeon for the Philadelphia Eagles.[88] Dr. Pepe arranged an MRI scan on Mr. Powell's knee.[89] Both Dr. Roedel and Dr. Pepe opined that the MRI clearly showed a tear to Mr. Powell's lateral meniscus.[90] Nothing Mr. Powell had done since the March MRI would explain a new torn meniscus and the pain Mr. Powell was experiencing in the knee had remained constant since at least January, except when he was treated for pain by Mr. Testa before the University's basketball games.

Drs. Roedel and Pepe asked to review a copy of the March MRI arranged by Mr. Testa.[91]

---

[84] Second Amended Complaint, Paragraph 90.
[85] Second Amended Complaint, Paragraph 92.
[86] Second Amended Complaint, Paragraph 93.
[87] Second Amended Complaint, Paragraph 94.
[88] Second Amended Complaint, Paragraphs, 95-96.
[89] Second Amended Complaint, Paragraph 97.
[90] Second Amended Complaint, Paragraph 98.
[91] Second Amended Complaint, Paragraph 99.

12

Mr. Testa was uncooperative and would not provide Mr. Powell with a copy of the March MRI.[92] Mr. Powell's representative learned who performed the March 2020 MRI and had to obtain a copy of it from the doctor's office.[93]

Drs. Roedel and Pepe compared the June 2020 image with the March 2020 image and opined that the scans were similar, and that the March 2020 scan showed a tear to Mr. Powell's lateral meniscus.[94] The image of the tear of the lateral meniscus in the March 2020 scan was so obvious it should not have been misdiagnosed.[95] The opinion that Mr. Powell tore his lateral meniscus was consistent with Mr. Testa's text back in January 2020.[96]

Such a standout college career capped by such a successful senior year should have guaranteed Mr. Powell to be selected as a lottery pick in the NBA Draft, but the professionals connected to the various teams in the NBA had suspected or discovered that Mr. Powell had a serious injury to his right knee that had gone untreated.[97] In light of Mr. Powell's medical condition, , no NBA team drafted Mr. Powell.[98] Mr. Powell's father subsequently spoke with Coach Willard who conceded that defendants made a mistake in not properly disclosing Mr. Powell's injury and not properly treating his injury, and suggested that the family consult with counsel.[99]

Given what occurred to both Mr. Powell and Ms. Smith, it is clear it was a pattern and practice of Seton Hall, through its trainers and other personnel, to mislead its student athletes on

---

[92] Second Amended Complaint, Paragraph 100.
[93] Second Amended Complaint, Paragraph 101.
[94] Second Amended Complaint, Paragraph 102.
[95] Second Amended Complaint, Paragraph 103.
[96] Second Amended Complaint, Paragraph 104.
[97] Second Amended Complaint, Paragraph 105.
[98] Second Amended Complaint, Paragraph 106.
[99] Second Amended Complaint, Paragraph 107.

3100960.1

its basketball teams, about their physical conditions and injuries, or simply to ignore them, so as to have them continue to play for the benefit of Seton Hall to their physical detriment.[100]

As a result, on July 14, 2021, plaintiffs filed an action against the defendants in the Superior Court of New Jersey, which was removed to this Court. Following defendants' initial Motion to Dismiss, an Amended Complaint was filed adding Ms. Smith as a plaintiff and Deja Craig as a defendant.

On April 26, 2022, the Court issued an Order and opinion granting in part and denying in part defendants' second Motion to Dismiss; specifically, the Court dismissed without prejudice Mr. Powell's claims for gross negligence finding that additional facts were necessary regarding Mr. Powell's knee injury and defendants' knowledge thereof. On May 24, 2022, plaintiffs filed a Second Amended Complaint which included the addition of numerous allegations addressing the deficiencies raised in the Court's opinion. Defendants' third Motion to Dismiss followed.

---

[100] Second Amended Complaint, Paragraph 165.

## ARGUMENT

### I.    Legal Standard

Defendants' argument that Mr. Powell has failed to state a claim for gross negligence is without merit.  It is well-settled that in considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim for which relief can be granted, this Court must accept as true all well-pleaded allegations and view them in a light most favorable to the non-moving party.  Parties cannot rely solely upon conclusory allegations that merely set forth the basic elements of a cause of action.[101]  Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.[102]

Defendants' Motion seeking dismissal of Mr. Powell's claims for gross negligence (set forth in Counts I-III of the Second Amended Complaint) should be denied as claims meet the standard put forth by the United States Supreme Court in *Ashcroft v. Iqbal.  Iqbal* provides that, in order to avoid dismissal under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[103]  *Iqbal* confirmed that the "plausibility" standard, originally espoused by the Supreme Court in *Twombly*, applied to all civil actions in federal court.[104]

In *Iqbal*, the Supreme Court held that district courts should undertake the following two-step analysis in considering motions to dismiss: (1) accept as true all factual, non-conclusory allegations in plaintiff's complaint and dismiss legal conclusions and "threadbare recitals of the

---

[101] *Bell Atlantic Corp v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).
[102] See *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).
[103] *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[104] *Id.* at 684.

elements of a cause of action;" (2) determine whether the complaint states a plausible claim for relief, rather than conceivable or possible, which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[105]

The Supreme Court's goal in *Iqbal* was to admonish the practice of providing "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" in order to prevent the filing of complaints which merely constitute fishing expeditions.[106]  The Second Amended Complaint here is anything but "threadbare" and does not fall into this category. Dismissal of Mr. Powell's claims, thus, will not further the goal of *Iqbal*. The Second Amended Complaint contains a concise statement of factual allegations providing a timeline an background for Mr. Powell's gross negligence claims.[107]  Such factual allegations support Mr. Powell's claims for gross negligence against defendants.

At this stage of the litigation, all allegations in the Second Amended Complaint are accepted as true and plaintiffs are provided "the benefit of every favorable inference."[108] Dismissal of Mr. Powell's claims would be improper even if the court disbelieves the factual allegations or believes "a recovery is very remote and unlikely."[109]

## II.    Dismissal of Mr. Powell's Claims Pursuant to Rule 12(b)(6) is Not Warranted

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint, not the merits of the case.  Defendants' arguments center on a factual dispute which not only cannot be decided at this stage of the litigation but is not instructive in forming the basis of Mr. Powell's claims. The issue is defendants' actions upon their believing in January 2020 that Mr. Powell

---

[105] *Id.* at 678-679.
[106] *Id.* at 678.
[107] See Second Amended Complaint, Paragraphs 16-107.
[108] *Lindstrom v. St. Joseph's School of the Blind, Inc.*, 2016 WL 5723658, *2 (D.N.J. September 30, 2016).
[109] *Bell Atlantic Corp. v. Twombly, supra*, 550 U.S. at 556.

3100960.1

sustained a tear to Mr. Powell's lateral meniscus.  The issue is not what an MRI may have shown a week after the season ended.  What the MRI showed is a contested fact.  But it does not address the defendants actions in the two months prior.

In view of the fact that gross negligence is "conduct that comes somewhere between simple negligence and the intentional infliction of harm or willful misconduct," courts have held "it is a matter of degree, and, as a matter of degree, it is a matter for the finder of fact."[110] Plaintiffs have met the pleading standards set forth in *Ashcroft v. Iqbal* and  *Bell Atlantic Corp. v. Twombly* as they relate to Mr. Powell's gross negligence claims against the defendants.  As such, dismissal pursuant to Rule 12(b)(6) must be denied.

Beyond that, defendants are wrong in claiming that Mr. Powell has failed to state a plausible gross negligence claim against defendants.  Negligence has been defined as "the failure to take precautions that cost less than the damage wrought."[111]  Applying that definition to this situation, it is defendants' decision to deceive plaintiffs for the sake of playing a few games for a middling college basketball program in exchange for irreparably damaging what could have been an up to 20-year career in professional basketball is a prime example of grossly negligent conduct.

The parties agree that the difference between negligence and gross negligence is a matter of degree.  Gross negligence is defined as "the want or absence of failure to exercise slight care or diligence…[which] comes somewhere between 'simple' negligence and the intentional infliction of harm, or willful misconduct."[112] The New Jersey Supreme Court explained that "[a]lthough gross negligence is something more than 'inattention' or 'mistaken judgment,' it

---

[110] *Ivy Hill Park Section III v. Smirnova*, 362 N.J. Super. 421, 425 (Law. Div. 2003) (citing *Clarke v. Twp of Mount Laurel*, 357 N.J. Super. 362 (App. Div.2003)).
[111] *Jerkins v. Anderson*, 191 N.J. 285, 298 (2007).
[112] *J.D. ex rel M.B.-D. v. Garfield Park Academy*, 2014 WL 6474331,*6 (App. Div. Nov. 20, 2014).

17

does not require willful or wanton misconduct or recklessness."[113] The New Jersey Supreme Court endorsed the model jury charge definition of gross negligence as "an indifference to another by failing to exercise even scant care or by thoughtless disregard of the consequences that may follow from an act or omission."[114]

Gross negligence involves "behavior which constitutes indifference to consequences."[115] The differences between negligence and gross negligence "cannot always be stated with mathematical precision. They must be determined by the finders of fact."[116] By any measure, however, such differences are easy to discern where the alleged facts involving the failure to advise young, elite student-athletes of injuries defendants *knew* were so serious they required rest and rehabilitation. Moreover, such differences are particularly evident where these students were under defendants' supervision and care, and where the failure to disclose the true nature of the injuries suffered while performing for defendants' financial benefit caused the plaintiffs serious additional harm.

To establish a cause of action for any form of negligence, including gross negligence, plaintiffs must establish a duty of care, a breach of that duty, proximate cause of damage, and actual damage.[117] Whether a duty of care exists is a question of law to be decided by the court,[118] and whether that duty was breached is a question of fact.[119]

---

[113] *Steinberg v. Sahara Sam's Oasis, LLC*, 226 N.J. 344, 364 (2016) (citing *Model Jury Charge (Civil)* § 5.12 "Gross Negligence" (2009)).
[114] *Id.* at 364-65.
[115] *Smith v. Kroesen*, 9 F. Supp. 3d 439, 442-443 (D.N.J. 2014) (citation omitted).
[116] *Stuyvesant Assocs. v. Doe*, 221 N.J. Super. 340, 344 (Law. Div. 1987).
[117] *W.H. v. R.C.*, 2020 WL 1041390, *6 (D.N.J. March 4, 2020).
[118] *Jerkins v. Anderson, supra*, 191 N.J. at 294.
[119] *Id.* at 305.

18

Factors analyzed to determine whether a duty of care exist include "fairness and public policy; foreseeability; the relationship between the parties; the nature of the conduct at issue; and the ability to alter behavior to avoid injury to another."[120]

Not all criteria are judged with the same weight. "Foreseeability of the risk of harm is the foundational element in the determination of whether a duty exists, but the determination of the existence of a duty is [ultimately] a question of fairness and public policy."[121]  In analyzing foreseeability, "a court must consider whether it is practical for a defendant to try to prevent the injury to another."[122]

In determining fairness and public policy, a court must identify, weigh, and balance four factors: "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution."[123]  The New Jersey Supreme Court has held that "when the defendant's actions are 'relatively easily corrected' and the harm sought to be prevented is 'serious,' it is fair to impose a duty."[124]

In support of their Motion, defendants rely on a skewed recitation of facts and, particularly, a wrongful characterization of the March 13, 2020, MRI scan as the key to Mr. Powell's claims. In reality, the facts alleged in the Second Amended Complaint show that, in January 2020, Mr. Testa believed that Mr. Powell had suffered a lateral meniscus tear; however, not surprisingly, the argument section of defendants' brief is devoid of any direct reference to Mr. Testa's January 14, 2020, text saying Mr. Powell has a lateral meniscus tear. Defendants appear to explain away the knowledge as follows: "[t]he bald allegation that Defendants

---

[120] *W.H. v. R.C.*, *supra*, 2020 WL 1041390, *7 (citations omitted).
[121] *Id.*
[122] *Franco v. Fairleigh Dickinson University*, 467 N.J. Super. 8, 26 (App. Div. 2021).
[123] *Jerkins v. Anderson*, *supra*, 191 N.J. at 295.
[124] *Id.* at 298 (citations omitted).

3100960.1

somehow clairvoyantly knew that Plaintiff Powell had suffered a lateral meniscus tear, despite

never conducting any medical imaging tests, simply is fatally implausible when the Court

considers that several months after Defendants allegedly 'knew' about the lateral meniscus tear,

they were provided with an MRI report from the independent Dr. Baltazar which clearly stated

[there is no lateral meniscus tear]."[125]  This is the crux of defendants' argument and it begs the

question: if Mr. Testa thought Mr. Powell had a lateral meniscus tear in January 2020, why did

he wait until March 13th to have him undergo an MRI? The answer is clear – in order to exploit

Mr. Powell for the University's own gain.  Clairvoyance on the part of defendants was not

required, rather, Mr. Testa, as Seton Hall's Director of Sports Medicine for over ten years, has

the expertise to identify a lateral meniscus tear.

Contrary to defendants' implication, medical imaging is not required to identify a lateral

meniscus tear; rather, it can often be identified during a physical exam by moving the knee and

leg into different positions.[126] That is precisely what Mr. Testa did - on January 6, 2020, Mr.

Testa conducted a physical examination of Mr. Powell during which Mr. Powell was laying on

his back while Mr. Testa attempted to move Mr. Powell's knee to Mr. Powell's chest, and tried

to move the knee laterally.[127]  The pain was so intense that Mr. Powell was unable to complete

these tasks; Mr. Testa provided him pills both on that date and on January 8, 2020 prior to Seton

Hall's game against Xavier.[128]  Days later, Mr. Testa mistakenly texted to Mr. Powell, "Ya

Myles Powell has a lateral meniscus tear."[129] While the text was clearly sent to Mr. Powell in

error as the it contained Mr. Powell's name, it is believed that Mr. Testa later advised Coach

---

[125] Def. Br. at ECF 19-1, pages 24-25 of 25.
[126] See e.g., https://www.mayoclinic.org/diseases-conditions/torn-meniscus/diagnostice-treatment/drc-20354823
(last visited 7/22/22).
[127] Second Amended Complaint, Paragraphs 61-62.
[128] Second Amended Complaint, Paragraphs 63-64.
[129] Second Amended Complaint Paragraph 70, Milstein Cert. Exhibit 1.

Willard that Mr. Powell has a lateral meniscus tear.[130]  Seton Hall, Coach Willard, and Mr. Testa knew or should have known that Mr. Powell's playing with his injury would exacerbate it and have the effect of damaging Mr. Powell's employment prospects; however, due to defendants' conduct Mr. Powell continued to play basketball for another two months.

Defendants' emphasis on the March 13, 2020 MRI scan indicating there is no tear is disingenuous and willfully downplays the role of Mr. Testa and Coach Willard in the context of the medical treatment of student-athletes.  Despite having knowledge of Mr. Powell's condition since January 2020, only after the season was cut short due to Covid-19 did defendants arrange for Mr. Powell to receive a more formal evaluation.   Defendants sent Mr. Powell to be examined by Dr. Anthony Festa (Head Team Physician for Seton Hall) who at the time was affiliated with the same practice as Dr. Baltazar, Imaging Specialists of North Jersey, LLC.[131] Mr. Testa took Mr. Powell to Dr. Festa and told Mr. Powell to not go to any other medical professional.[132] Dr. Festa's name appears on the MRI scan report.[133]  Neither Dr. Festa nor any other medical professional discussed Mr. Powell's medical care with Mr. Powell.[134]

The cases cited by defendants are inapposite, and do not involve gross negligence claims. For example, in *Basil v. Wolf* the New Jersey Supreme Court affirmed of summary judgment of a medical malpractice claim finding that the plaintiff could not hold the decedent's employer liable for negligent hiring of an independent contractor doctor who misdiagnosed the decedent, where it was the workers' compensation insurer that had retained the doctor.[135]  Mr. Powell's claim is

---

[130] Second Amended Complaint, Paragraphs 73-74.
[131] Second Amended Complaint, Paragraphs 85-86.
[132] Second Amended Complaint, Paragraphs 87-88.
[133] Def. Motion, Exhibit D.
[134] Second Amended Complaint, Paragraph 90.
[135] *Basil v. Wolf*, 193 N.J. 38, 62 (2007).

21

not medical malpractice against Dr. Baltazar, it is gross negligence against the defendants.  As such, the *Basil* court's independent contractor analysis is not relevant here.

Similarly, *Jarrah v. Trump Hotels & Casino Resorts, Inc.*[136] stands for the proposition that a casino is not liable under the apparent authority doctrine for negligent medical treatment provided by a co-defendant medical services contractor.  Under New Jersey law, a hotel has no duty to provide medical service and only a limited duty to secure medical care for a patron who is rendered helpless; in fact, no duty arises if the patron is accompanied by friends and family who could summon medical assistance if necessary.[137] Thus, in granting the casino's motion for summary judgment, the court in *Jarrah* explained "[The casino] is not a provider of medical services. Thus, it would be unreasonable for a person who gambles at the casino to rely on [the casino] to provide quality medical service."[138] The duty owed to gambler at a casino in need of medical care is a far cry from the that undertaken by a University that undertakes the responsibility of providing medical care for its student-athletes.  For one, unlike a random casino patron, a university is fully aware of its athletes' medical status and conditions. Here, Mr. Powell reasonably relied on defendants to provide medical care in accordance with the University's representations that it would provide proper coaching, medical care, training and oversight of Mr. Powell's basketball activities.[139] Defendants woefully failed in providing even scant care.

Applying the facts to the established legal precedent, and providing plaintiff with all favorable inferences, it is clear that the facts pled by plaintiffs are sufficient to establish defendants' gross negligence with regard to Mr. Powell.  Common sense notions of fairness dictate that when a university, its coaches, and its medical personnel undertake to provide for the medical care of a

---

[136] 487 F.Supp.2d 522, 530 (D.N.J. 2007).
[137] *Id.* at 527.
[138] *Id.* at 530.
[139] Second Amended Complaint, Paragraphs 19-20.

3100960.1

student athlete, that student athlete can and will rely on the information provided by the university, its coaches, and its medical personnel. And when that university, its coaches, and its medical personnel mislead that student athlete for their own short-term gain to the detriment of the student athlete, that conduct rises above mere negligence. At a minimum, defendants were grossly negligent in how they performed their duties to Mr. Powell.

The facts as alleged by Mr. Powell are akin to the facts plead by co-plaintiff Jasmine Smith. This court held that Ms. Smith's claims of her suffering an injury, defendants' providing her a diagnosis, defendants' failure to allow her to consult with medical personnel, misrepresentations by defendants, continued pain, and recommendation by defendants that she continue with the same ineffective treatment give rise to a claim of gross negligence. So, too, has Mr. Powell made these claims. Thus, similar to Ms. Smith, Mr. Powell's claims should move forward.

## III.   Dismissal With Prejudice is Inappropriate

It has long been held that the Third Circuit "frowns on dismissal with prejudice" in the context of motions to dismiss.[140] Specifically, Third Circuit authority provides that "dismissal with prejudice is only appropriate in limited circumstances and doubts should be resolved in favor of reaching a decision on the merits."[141] As set forth above, this matter does not present one of the limited circumstances requiring dismissal with prejudice. In the event the Court is inclined to grant defendants' Motion, plaintiffs respectfully request leave to file an amended pleading in order to address any deficiencies raised by this Court.

---

[140] See *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 432, n. 3 (D.N.J. 1999).
[141] *Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002).

3100960.1

## CONCLUSION

For the foregoing reasons, plaintiffs request that this Court enter an Order denying defendants' Motion in its entirety.  In the event any of defendants' argument are accepted by the Court, plaintiffs respectfully seek leave to file an amended pleading.

**SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.**

Dated: July 29, 2022           By:    */s/ Alan C. Milstein*
                                            Alan C. Milstein, Esquire
                                            Jeffrey P. Resnick, Esquire
                                            308 Harper Drive, Suite 200
                                            Moorestown, NJ 08057
                                            Telephone: 856-662-0700
                                            Facsimile: 856-661-2068
                                            amilstein@shermansilverstein.com
                                            jresnick@shermansilverstein.com
                                            Attorneys for Plaintiffs

3100960.1