UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MYLES POWELL and JASMINE SMITH,<br><br>Plaintiffs,<br>v.<br><br>SETON HALL UNIVERSITY, KEVIN WILLARD, ANTHONY TESTA, DEJA CRAIG, and JOHN OR JANE DOES 1-10<br>Defendants. | Case No. 21-cv-13709<br><br>OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

**WILLIAM J. MARTINI, U.S.D.J.:**

I. **INTRODUCTION**

Plaintiffs Myles Powell and Jasmine Smith are former collegiate basketball players who played for Defendant Seton Hall's basketball teams between 2019 and 2021. Both plaintiffs suffered knee injuries during their basketball seasons: Powell during the 2019-2020 men's season, and Smith during the 2020-2021 women's season. Plaintiffs' injuries were treated, in part, by Seton Hall's athletic trainers—namely, Defendants Anthony Testa and Deja Craig. This case concerns whether the athletic trainers were grossly negligent in their treatment of the Plaintiffs, and if they were, whether Defendant Seton Hall should be held vicariously liable for their gross negligence.

Before the Court is Defendants' motion for summary judgment. The Court decides the motion without oral argument. L.R. 78.1(b). For the reasons set forth herein, Defendants' motion is granted.

II. **BACKGROUND**[1]

A. **Myles Powell**

Plaintiff Powell played basketball for Defendant Seton Hall during the 2019-2020 men's basketball season. SOMF ¶ 1. On January 12, 2020, Powell informed Defendant Testa, who was then the Head Athletic Trainer at Defendant Seton Hall, that he was experiencing pain in his right knee. SOMF ¶ 2. Testa examined Powell the next day. SOMF ¶ 3. After his examination, Testa

---

[1] The facts in this section are taken from the Defendants' statements of material facts, Plaintiffs' response to the same, the exhibits attached thereto. To the extent that the Court relies on facts that one party denies in whole or in part, it does so because the Court has determined that the record leaves no genuine dispute as to the facts' authenticity. For ease of reference, the Court will use the following abbreviations to refer to documents in the record:

"**SOMF**" – Defendants' Statement of Undisputed Material Facts (ECF No. 90-4).
"**Resp. SOMF**" – Plaintiffs' Response to Defendants' Statement of Undisputed Material Fact (ECF No. 91-14).

inadvertently sent a text message to Powell that was intended for someone else; in the message, Testa wrote "Ya Myles Powell has a lateral meniscus tear." ECF No. 90-8 at 13. Testa promptly referred Powell for further examination to Dr. Anthony Festa, a licensed New Jersey physician and an orthopedic surgeon who served as the head team physician.[2] SOMF ¶ 3.

Dr. Festa examined Powell the following day. SOMF ¶ 3. At his deposition, Dr. Festa recalled that the referral was for a high ankle injury, but noted that Powell was also experiencing some knee pain. Resp. SOMF ¶ 6; ECF No. 90-9 45:19-46:22. At the conclusion of his examination, Dr. Festa diagnosed Powell with patella tendonitis. SOMF ¶ 6. Dr. Festa did not recommend limiting Powell's participation in basketball activities. SOMF ¶ 6. Dr. Festa testified that he did not suspect a lateral meniscus tear, and accordingly did not order an MRI at that time. SOMF ¶¶ 8-9.

Powell continued to play basketball during January and February of 2020 while receiving needling procedures from Dr. Matthew Lipp and, according to Powell, receiving "medicine and vitamins" to treat his knee injury. SOMF ¶ 13; Resp. SOMF ¶ 13; ECF No. 90-7 94:4-12, 116:11-20.[3] Testa continued to work with Powell in his capacity as the team's trainer. On February 17, 2020, Powell sent Testa a message complaining of knee pain again. SOMF ¶ 14. Testa again arranged for Powell to be seen by Dr. Festa the next day; Dr. Festa examined Powell and determined that his condition did not require limitations on Powell's basketball activities. SOMF ¶¶ 15-16. Dr. Festa remained actively involved in the treatment of Powell's knee injury throughout the 2019-20 basketball season and was responsible for prescribing oral medication. SOMF ¶ 19. Dr. Lipp treated Powell by administering needling therapy or injections. SOMF ¶ 13; Resp. SOMF ¶ 20.

At the close of the 2020 season (which was abbreviated due to the cancellation of the season for Covid-19), Dr. Festa examined Powell's knee again and ordered an MRI. SOMF ¶ 21. According to the MRI report, the MRI showed "12mm chondral defect" and "no medial or lateral meniscus tear." Resp. SOMF ¶ 21; ECF No. 90-9. On April 15, 2020, Dr. Festa examined Powell again, and once again did not diagnose a lateral meniscus tear. SOMF ¶ 24.[4]

Powell started seeing a new doctor, Dr. Jong T. Shin, on April 27, 2020. SOMF ¶ 25. Dr. Shin was not affiliated with Seton Hall in any capacity. At his initial visit with Dr. Shin, Powell was not diagnosed with a lateral meniscus tear and his basketball activities were not limited (though his activity was inherently limited because he was recovering from a recent emergency appendectomy). SOMF ¶¶ 25-26; Resp. SOMF ¶ 26. Dr. Shin continued treating Powell throughout the following months, including monitoring and treating his existing knee injury. ECF No. 90-11 45-47. In June 2020, Powell returned to Dr. Shin complaining of increased knee pain,

---

[2] Though he held the role of head team physician, Dr. Festa was not employed by Seton Hall, nor have Plaintiffs brought any claims against Dr. Festa.

[3] The parties dispute whether Dr. Lipp injected Powell with medication or was using "dry needling" techniques; because the parties agree that these treatments were administered only by Dr. Lipp and not by Defendant Testa, *see* SOMF ¶ 20, Resp. SOMF ¶ 20, that dispute is not germane to the Court's resolution of the liability of the defendants in this suit.

[4] The Court disregards Plaintiff's reference, Resp. SOMF ¶ 19, to a website, whose contents are not in evidence and have not been accompanied by the expert testimony that would be necessary to opine on the meaning of the results of tests recorded in medical records.

and Dr. Shin (in consultation with a radiologist) ordered an ultrasound and a repeat MRI, which showed a lateral meniscus tear. SOMF ¶ 28.

### B.  Jasmine Smith

Plaintiff Smith played for Defendant Seton Hall during the 2020-2021 women's basketball season. SOMF ¶ 29. She injured her knee during practice on October 27, 2020. SOMF ¶ 30. Defendant Craig (the team's trainer) and one of her colleagues promptly brought Smith to the Sports Medicine facility for evaluation where Dr. Michael Kelly examined Smith and ordered an MRI. SOMF ¶ 31; ECF No. 90-12 14:1-15:6. Smith's MRI took place the next day. SOMF ¶ 32; ECF No. 90-12 at 84. The MRI showed a bruised, and possibly torn, meniscus. *Id.* It also showed a chondral defect. *Id.* Smith did not immediately return to basketball activities. ECF No. 90-11 at 96. On October 30, 2020, Smith was seen by Dr. Festa, who ordered a repeat MRI with contrast. SOMF ¶ 34; ECF No. 90-12. The second MRI report noted that both the medial and lateral meniscus were "without tear" and confirmed the meniscus contusion and chondral defect. ECF N0 90-12 at 96. Dr. Festa regarded the meniscus tear as the acute injury and expected that the chondral defect was likely chronic, based on his understanding of the commonplace nature of chondral defects even in asymptomatic college basketball players. ECF No. 90-0 at 28-29.

After the second MRI showed no meniscus tear, Smith gradually returned to basketball activities. ECF No. 90-11 at 96. Smith was initially referred to physical therapy, but voluntarily stopped attending while continuing to play basketball in November 2020. SOMF ¶ 36. Smith explained that she originally attended physical therapy, but after the diagnosis of a meniscus contusion was confirmed, and after Defendant Craig explained to her what a meniscus contusion was and how it healed, Smith ceased to see a need to attend her physical therapy sessions. ECF No. 90-11 at 96. Defendant Craig did not tell Smith to discontinue her physical therapy. *Id.* Smith continued to play throughout the 2020-2021 basketball season while treating her knee pain, when it occurred, with ice and ibuprofen. SOMF ¶ 37; Resp. SOMF ¶ 37. At the end of the season, Smith transferred from Seton Hall to another university to continue playing basketball. SOMF ¶ 40. In late June 2021, after consulting with a new doctor, Smith underwent surgery to treat the defect in her left knee. SOMF ¶ 42.

### C.  Procedural Background

Powell initiated this action on July 14, 2021 by filing a four-count complaint against Seton Hall, men's basketball coach Kevin Willard, and Testa in the Superior Court of New Jersey, Law Division, Essex County asserting negligence and breach of fiduciary duty claims against all three Defendants, as well as a breach of contract claim against Seton Hall. *See generally* Complaint, Notice of Removal Ex. A., ECF No. 1. Defendants timely removed the action to this Court on the basis of its diversity jurisdiction. Following Defendants' motion to dismiss the initial complaint, Powell filed an amended complaint ("First Amended Complaint" or "FAC"). The FAC added Smith as a Plaintiff, Craig as a Defendant, and asserted a total of thirteen counts. See FAC, ECF No. 8. Defendants moved to dismiss the FAC on September 30, 2021, and the Court granted in part and denied in part Defendants' motion on April 26, 2022. See ECF Nos. 10, 14-15. Plaintiffs filed a Second Amended Complaint (or "SAC") on May 24, 2022 asserting six counts, all of which allege gross negligence as to each of the Defendants (Counts 1, 2, and 3 by Powell against Testa, Willard, and Seton Hall, respectively; Counts 4, 5, and 6 by Smith against Craig, Testa, and Seton Hall; respectively). See ECF No. 16. Defendants moved to dismiss Counts 1, 2, and 3 in the SAC;

that motion was denied. ECF Nos. 22, 23. On February 14, 2024, Powell's claim against Willard was terminated by stipulation of the parties. ECF No. 62.

The SAC remains the operative complaint, and is now comprised of five counts:

- Gross negligence by Defendant Testa with respect to his treatment of Plaintiff Powell (SAC ¶¶166-172);
- Vicarious liability for Defendant Seton Hall for the gross negligence of Defendant Testa in his treatment of Plaintiff Powell (SAC ¶¶ 173-177);
- Gross negligence by Defendant Craig in her treatment of Plaintiff Smith (SAC ¶¶ 184-191);
- Gross negligence by Defendant Testa in his treatment of Plaintiff Smith, either as the trainer directly responsible for her care or as Defendant Craig's supervisor (SAC ¶¶ 192-196); and
- Vicarious liability for Defendant Seton Hall for the gross negligence of Defendants Craig and Testa in their treatment of Defendant Smith (SAC ¶¶ 197-202).

On May 15, 2025, Defendants filed their motion for summary judgment, arguing that the undisputed material facts uncovered in discovery preclude judgment for the Plaintiffs as a matter of law. ECF Nos. 90, 90-1. Briefing concluded on June 12, 2025. ECF No. 92.

### III. LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is a sufficient evidentiary basis on which a reasonable factfinder could return a verdict for the non-moving party, and a fact is 'material' if it could affect the outcome of the suit under governing law." *Portillo v. Nat'l Freight, Inc.*, -- F. Supp. 3d. --, 2025 WL 1298347 (D.N.J. May 2, 2025) (citing *Kaucher v. Cnty. Of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006), and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"A party's failure to make a showing that is 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial' mandates the entry of summary judgment." *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 857-58 (3d Cir. 2000) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464 (3d Cir. 2011) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quoting *Matsushita Elect. Indus. Co. Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))).

As this is a diversity jurisdiction case, New Jersey tort law applies. *Avaya Inc., R.P. v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir. 2016); *see also Lavecchia v. Walmart Inc.*, 2023 WL 4074059 (3d Cir. June 20, 2023) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). The essential elements to state a claim for negligence and gross negligence are identical under New Jersey law: (1) the existence of a duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; (3) that the defendant's breach caused the plaintiff's injury; and (4) that the plaintiff suffered damages as a result. *See Smith v. Kroesen*, 9 F. Supp. 3d 439, 442 (D.N.J. 2014); *accord Brunson v. Affinity Fed. Credit Union*, 972 A.2d 1112, 1122-23 (N.J. 2009).

   The difference between simple negligence and gross negligence is one of degree rather than of quality. *See Kroeson*, 9 F. Supp. at 442. Simple negligence is the failure to exercise ordinary or reasonable care that leads to a natural and probable injury; "*gross* negligence is the failure to exercise slight care or diligence." *Steinberg v. Sahara Sam's Oasis, LLC*, 142 A.3d 742 (N.J. 2016) (emphasis added and quotations omitted). In other words, "gross negligence is an indifference to another by failing to exercise even scant care or by thoughtless disregard of the consequences that may follow from an act or omission." *Id.* at 754-75 (comparing definitions of gross negligence in other jurisdictions). While this standard requires "something more than inattention or mistaken judgment, it does not require willful or wanton misconduct or recklessness." *Id.* at 754. "Summary judgment in a defendant's favor may be appropriate in a gross negligence case where there are no material disputes of fact and the conduct, even if negligent, was clearly not an egregious departure from the standard of reasonable care." *Bartlett v. Push to Walk*, 2018 WL 1726262, *9 (D.N.J. Apr. 10, 2018).

## IV. DISCUSSION

  Defendants argue that the undisputed material facts leave no genuine dispute as to whether the Seton Hall trainers grossly violated the duty of care they owed to the Plaintiffs. Their main argument is that the Seton Hall trainers' duty was satisfied—or at least was not grossly breached—because Defendants "immediately" referred Plaintiffs to medical doctors after learning of their injuries and those doctors made the diagnoses that governed their care. They further argue that Plaintiffs' own expert testimony on the appropriate standard of care fails to establish that the trainers' actions were grossly negligent. On both points, the Court agrees.[5]

### A. Scope of Athletic Trainers' Duty of Care

  "The existence and scope of a duty of care are generally questions of law for a court to decide." *Antar v. BetMGM, LLC*, 2025 WL 1219316 (3d Cir. Apr. 28, 2025) (citation modified); *see also Robinson v. Vivirito*, 86 A.3d 119, 124 (N.J. 2014) (same). "A duty is an obligation imposed by law requiring one party to conform to a particular standard of conduct toward another." *Coleman v. Martinez*, 254 A.3d 632, 642 (N.J. 2021) (citation modified). "Whether, in a given context, 'a duty to exercise reasonable care to avoid the risk of harm to another exists is a question of fairness and policy that implicates many factors." *Id.* (citation modified). To that end, the Court "must first consider the foreseeability of harm to a potential plaintiff and then analyze whether accepted fairness and policy considerations support the imposition of a duty." *Holm v. Purdy*, 285 A.3d 857, 867 (N.J. 2022) (quoting *Coleman*). That analysis should include consideration of "the (1) relationship of the parties, (2) nature of the risk, (3) opportunity and ability to exercise care, and (4) public interest." *Id.* (quoting *Coleman*). Here, no party disputes that athletic trainers owe some duty of care to the athletes with whom they work,[6] but they disagree on the scope of that duty. *Compare* ECF No. 90-1 at 19-20 (Defendants) *with* ECF No. 91 at 33 (Plaintiffs).

---

[5] Because its breach of duty determination is dispositive, the Court needs not, and does not, reach Defendants' causation argument.

[6] If Defendants did argue that athletic trainers do not owe a duty of care to athletes under their care, the Court would still find they do. In consideration of the relevant factors, it is apparent that athletic trainers do owe a duty of care to the athletes with whom they work. The relationship between athletes and their trainers is derivative of the treatment trainers provide to the injuries and pain experienced by the athletes. The risk of mismanagement of injuries is significant (and is, indeed, the risk that athletes seek to avoid by working with a trainer). By the nature of the

1. Regulatory Standard of Conduct

It is a "well-established principle that the violation of a legislated standard of conduct may be regarded as evidence of negligence if the plaintiff was a member of the class for whose benefit the standard was established." *Alloway v. Bradlees, Inc.*, 723 A.2d 960 (N.J. 1999) (quoting *J.S. v. R.T.H.*, 714 A.2d 294 (N.J. 1998)); *see also Costa v. Gavvione*, 975 A.2d 451, 455 (N.J. App. Div. 2009). On that point, the Restatement (Second) of Torts, § 286 (1965) states that:

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

Rest. 2d Torts § 286 (1965). *See also, e.g., Piscitelli v. Classic Residence by Hyatt*, 973 A.2d 948, 962 (N.J. App. Div. 2009) (quoting same). Still, "[c]ompliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions." Rest. 2d Torts § 288C (1965).

The State of New Jersey regulates the licensure of athletic trainers and the scope of their practice as follows:

> A licensed athletic trainer in an interscholastic, intercollegiate, intramural, or professional athletic setting [...] may provide to an athlete:
>
> 1. Evaluation of injuries;
>
> 2. Conditioning programs for the prevention and management of injuries including:
>
>> i. Maintenance programs;
>>
>> ii. Reconditioning programs;
>>
>> iii. Exercise programs; and
>>
>> iv. Bandaging, wrapping, taping, padding, bracing and splinting procedures;

---

relationship between trainers and their athletes, the trainers have the ability and opportunity to exercise their duty of care for the athletes under their care. And the public interest, as reflected by the scope of practice enacted by state regulation, is well-served by the imposition of a duty of care.

> 3. Testing of neuromotor and musculoskeletal functional capability for the purposes of conditioning, reconditioning or otherwise evaluating the athlete's performance capability; and
>
> 4. First-aid.

N.J.A.C. § 13:35-10.7(a). The regulation goes on to enumerate appropriate "physical treatment modalities" that are appropriate when included in a plan of care under a physician's supervision. *Id.* § 13:35-10.7(c). And finally, it includes the following two provisions:

> (e) A licensed athletic trainer shall not diagnose an injury or illness. Prior to implementing or continuing athletic training services, the licensed athletic trainer shall exercise professional judgment to determine whether any intervening circumstances have adversely affected the athlete's ability to participate in or continue to participate in athletic training.
>
> (f) A licensed athletic trainer shall immediately refer an athlete to a health care professional licensed in this State if the licensed athletic trainer has cause to believe that athletic training is contraindicated or symptoms or conditions are present that require services outside the scope of a licensed athletic trainer's practice.

### 2. Expert Testimony on Standard of Conduct

Once the existence of a legal duty has been established, "expert testimony is useful to fact finders in determining whether a standard of conduct has been violated." *Burroughs v. City of Atlantic City*, 560 A.2d 725, 732 (N.J. App. Div. 1989) (cert. denied); *see also Serure v. Sheehan*, 2015 WL 4250943 (N.J. App. Div. July 15, 2015) (quoting same). Plaintiffs offered the report and deposition testimony of Dr. Glenn Edgerton to support their argument that the Defendants breached the applicable standard of conduct. Dr. Edgerton's report states that the purpose of his investigation was "to determine if [Defendants], through their interactions during the days leading up to, on the day of the injury, and the days following the injury to both Mr. Powell and Ms. Smith acted reasonably, appropriately, and in accordance with the applicable standard of care, specifically related to disclosure of risks of continued play and in the area of documentation and records." ECF No. 90-10 at 105. But at his deposition, Dr. Edgerton conceded that his criticism of the athletic trainers was limited to their documentation practices, not the care they provided:

> Q. ... [I]f I'm understanding your opinions in this matter, you don't have any criticism of the actual care that either Myles Powell or Miss Smith received from the actual—from the Seton Hall athletic trainers? You're criticizing the documentation of the care that they received, correct?
>
> A. I'm criticizing the documentation of what truly occurred and the specifics of what was – what the condition was, yes. So I'm here to talk about the documentation piece.
>
> Q. But you're not here to talk about what was actually done by the athletic trainers in terms of their care and treatment, correct?

> A. I'm not here to talk about the care that was provided.

ECF No. 90-10 at 63. In his report, he also criticizes Defendant Testa for failing to disclose the risk to Plaintiff Powell of playing on a torn meniscus, but at his deposition, he conceded that "the diagnosis from Dr. Festa," not Testa, "is the diagnosis that matters," and that once Dr. Festa had evaluated Powell's injury "there was no longer a diagnosis of a suspicion of a right lateral meniscus tear." ECF No. 90-10 at 42. When pressed at his deposition, even Dr. Edgerton's criticism of Defendants' documentation practices was relatively limited—he contended only that "the documentation should have been more robust and clear," ECF No. 90-10 at 76, and conceded at multiple points that areas of documentation he criticized in his report were, in fact, documented in Seton Hall's files, *see, e.g., id.* at 42-44; 52-53; 54-55; 57.

For these reasons, Dr. Edgerton's testimony concerning the standard of conduct applicable to athletic trainers influences the Court's determination only to the extent that it emphasizes an athletic trainer's duty to maintain accurate and detailed documentation of their services.

### 3. Conclusion Regarding Standard of Conduct

In short, an athletic trainer's duty of care requires the reasonable exercise of professional judgment in the evaluation of suspected injuries, implementation of conditioning programs to prevent and manage injuries, testing and evaluation of an athlete's performance capability, and the provision of first aid. In some cases, it may also require the implementation of additional therapies to treat and manage known injuries under the supervision of a licensed physician. It does not include the diagnosis of injury or illness, and instead requires that athletic trainers who suspect that an athlete requires services outside their scope of service (including, for example, medical diagnosis or diagnostic imagery) must refer the athlete to a doctor for medical evaluation. As discussed above, the standard of conduct for an athletic trainer also requires the maintenance of accurate and detailed documentation of services provided.

### B. Whether the Seton Hall Athletic Trainers Violated their Duties of Care

With this standard of care in mind, the Court readily concludes that Plaintiffs have not produced evidence sufficient to sustain their claim that Defendants violated the applicable standard of conduct. When Powell notified Testa of his injury, and Testa apparently suspected that Powell had suffered a lateral meniscus tear, Testa promptly arranged for Powell to be examined by a doctor the next day. When Dr. Festa determined that Powell had not suffered a meniscus tear, and determined not to restrict Powell's basketball activities, Testa deferred to that judgment, continued working with Powell to manage his injuries, and arranged for Dr. Festa and Dr. Lipp to provide any treatments they determined were necessary but outside of the scope of conduct for an athletic trainer. This is precisely what the standard of conduct for an athletic trainer demands.

When Smith was injured, Craig brought her directly to a doctor for evaluation and she promptly received an MRI. When her first MRI indicated that an injury which might require cessation of basketball activities (*i.e.*, a torn meniscus) might be present, Dr. Festa ordered a repeat MRI. While awaiting the results of the second MRI, Smith did not resume basketball activities. When the second MRI ruled out a torn meniscus and confirmed the diagnosis of a meniscus contusion, Craig explained the nature of Smith's injury to her and Smith was instructed to partake in physical therapy. The record does not indicate whether one of the trainers or one of Smith's doctors recommended physical therapy, but it is undisputed that Plaintiff Smith acted on her own

judgment by deciding to stop attending her physical therapy sessions—Craig did not tell her to stop participating.

Nothing in the record indicates that Defendants Craig or Testa "fail[ed] to exercise slight care or diligence." *Steinberg v. Sahara Sam's Oasis, LLC*, 142 A.3d 742 (N.J. 2016) (emphasis added and quotations omitted). To the contrary, the record confirms that both trainers reacted to the news of the Plaintiffs' injuries by engaging with medical doctors to perform necessary diagnostic procedures that were outside of the scope of their own duties of care, and that they then (correctly) deferred to the doctors' determinations. There is no suggestion that either athletic trainer defied the recommendations or instructions of the supervising physician(s), nor of any other "egregious departure from the standard of reasonable care." *Bartlett v. Push to Walk*, 2018 WL 1726262, *9 (D.N.J. Apr. 10, 2018). While the Plaintiffs' expert witness criticized Defendants' documentation of the treatments they provided, the record, even viewed in the light most favorable to the Plaintiffs, does not permit the determination that any such deviation from the appropriate standards of documentation was sufficiently severe to constitute gross negligence.

In short, the undisputed material facts confirm that the manner of care provided to the Plaintiffs by Defendants Testa and Craig was "clearly not an egregious departure from the standard of reasonable care." *Bartlett v. Push to Walk*, 2018 WL 1726262, *9 (D.N.J. Apr. 10, 2018). Accordingly, Defendants Testa and Craig are entitled to summary judgment.

### C.   Seton Hall's Liability

Plaintiffs' claims against Defendant Seton Hall rely on the theory that Seton Hall is vicariously liable for the tortious activities of its agents—*i.e.*, Defendants Testa and Craig. *See* Pl. Opp. Br. at 39, ECF No. 91 ("Plaintiffs agree with defendants that their claims against Seton Hall stem from the conduct of Mr. Testa and Ms. Smith, Seton Hall's employees."). Because the Court has concluded that Defendants Testa and Craig were not grossly negligent, and therefore committed no tortious activity, Defendant Seton Hall is entitled to summary judgment as to the vicarious liability claims.

## V.   CONCLUSION

For the foregoing reasons, Defendants' motion to for summary judgment is **GRANTED**.

An appropriate order follows.

July 23, 2025

WILLIAM J. MARTINI, U.S.D.J.